UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

NXXI INC.,
f/k/a NUTRITION 21, INC., et al.,                                    Case No. 14-CV-8082 (KMK)

                        Debtors.
-------------------------------------------------------------X       OPINION & ORDER

NATURE'S PRODUCTS, INC.,

                        Appellant/Cross-Appellee,

        -v-

NXXI INC., f/k/a NUTRITION 21, INC.,

                        Appellee/Cross-Appellant.

Appearances:

Martin Stein, Esq.
Heller, Horowitz & Feit, P.C.
New York, NY
*Counsel for Appellee/Cross-Appellant*

Robert D. Peters, Esq.
Gary Robinson, P.A.
Miami, FL
*Counsel for Appellant/Cross-Appellee*

Anthony C. Robinson, Esq.
Nature's Product, Inc.
Sunrise, FL
*Counsel for Appellant/Cross-Appellee*

KENNETH M. KARAS, District Judge:

        Nature's Products, Inc. ("NPI") and NXXI, Inc. ("NXXI" or "N21" or "Debtor"), each

appeal from a final judgment entered by the bankruptcy court (Hon. Robert J. Drain) on July 2,

2014.  For the reasons given herein, both appeals are denied and the judgment of the bankruptcy court is affirmed.

## I.  Background

### A.  Facts

This adversary proceeding arose out of the business relationship between Walgreen Co. ("Walgreen") and two of its former vendors, N21 and NPI.  Below are certain relevant facts that, unless qualified or otherwise noted, are not seriously in dispute among the Parties.

#### 1.  N21 and Walgreen

 Beginning in May 2006, N21 sold two categories of dietary supplements to Walgreen, which Walgreen then resold to its customers.  (Br. of NXXI, Inc. ("N21 Br.") 5 (Dkt. No. 26); Appellant's Initial Br. ("NPI Br.") 4 (Dkt. No. 23).)  The first category, "Branded Products," were sold under N21 brand names, such as Iceland Health and Prescriptix.  (N21 Br. 5; *see also* NPI Br. 4.)  The second category, "Private Label Products," were sold under Walgreen brand names such as Finest Natural.  (N21 Br. 5; *see also* NPI Br. 4.)  Branded Products were sold to Walgreen on a guaranteed basis, meaning that Walgreen could return Branded Products at any time for a full refund.  (Tr. Decl. of Scott Minger ("Minger Decl.") ¶ 9 (Dkt. No. 151, 11-AP-8367 Dkt.).)  Although Private Label Products were not sold to Walgreen on a guaranteed basis, Walgreen regularly made claims and took deductions against N21's open invoices for damaged, defective, or expired Branded Products and Private Label Products.  (N21 Br. 5 (citing Trial Exhibit ("TE") 1; TE 24).)

It is undisputed that, during the course of N21's and Walgreen's business relationship, N21 received complaints from vendors (including Walgreen) and consumers about various

products provided by N21 to Walgreen, (*see, e.g.*, N21 Br. 5–6; NPI Br. 12–13), although the Parties disagree about the degree to which the product-related complaints resulted in the deterioration of the relationship between N21 and Walgreen.

### 2.  N21 Sells its Business to NPI

In the fall of 2009, NPI and N21 began to negotiate for the purchase of N21's retail and direct response businesses, the former of which is involved in this Adversary Proceeding.  (N21 Br. 6 & n.4.)  NPI and N21 signed a non-binding letter of intent on October 14, 2009 for the purchase by NPI of N21's business.  (TE 151.)  The letter of intent stated that NPI would be provided with certain information about N21's business at NPI's request and that NPI would be permitted to speak to N21's clients, customers, and employees.  (*Id.* ¶ 5.)[1]

Jose Minski, President of NPI ("Minski"), and Michael Zeher, President of N21, negotiated the ultimate Asset Purchase Agreement ("APA") that resulted in the sale of N21's retail business to NPI.  (N21 Br. 6, 9.)  The APA was signed on December 29, 2009, and the closing occurred on the same date.  (*Id.* at 9; *see* TE 31 ("APA").)

Pursuant to the APA, NPI agreed to purchase all of N21's accounts receivable, excluding those listed on the Working Capital Adjustment Schedule attached to the APA as Exhibit 1.5. (APA § 1.1(b).)  Exhibit 1.5 excluded from the assets being sold all accounts receivable that were outstanding for more than 90 days, and all accounts receivable for any customer whose invoices outstanding for more than 90 days represented more than 25% of the customer's total

---

[1] N21 asserts that NPI learned quite a bit about N21's relationship with Walgreen through the due diligence process.  (*See, e.g.*, N21 Br. 7–8.)  However, the exact contours of NPI's due diligence processes are not relevant to the Court's Opinion.

outstanding balance.  (APA Ex. 1.5.)  Although more than 25% of N21's accounts receivable

from Walgreen were more than 90 days old, NPI agreed to purchase (as provided for in Exhibit

1.5) $209,717.88 in unspecified Walgreen accounts receivable.  (*Id.*)

Pertinent to this proceeding, the APA contained a provision requiring NPI to assume

certain liabilities post-closing.  The provision reads, in pertinent part:

> <u>Assumption of Liabilities</u>.  The Buyer shall assume (i) the Seller's trade accounts
> payable for the Business as of the Closing, specifically excluding payables which
> are subject to litigation against the Seller, (ii) present and future obligations of
> Seller under the Assigned Contracts, (iii) and *any existing or future claims by
> retailers for returns and allowances, charge backs, "unsalables" and promotional
> allowances, or equivalent deductions or charges however called, whether known
> on [sic] unknown* and (iv) any future product liability claims in respect of any
> Product sold by Buyer after Closing excluding sale of Seller's existing Inventory
> sold and delivered to Buyer hereunder (collectively "Assumed Liabilities"). . . .

(APA § 1.3(a) (emphasis added).)

### 3.  Walgreen and NPI

Following the closing of the APA, Walgreen dealt directly with NPI and began to

purchase from NPI the same products it had previously purchased from N21.  (N21 Br. 10; *see

also* Minger Decl. ¶ 48.)  In February 2010, Walgreen asked NPI to accept the return of five

Branded Products that N21 had sold to Walgreen.  (Trial Transcript ("Trial Tr.") 46–47.)  As part

of a pre-trial ruling on various motions for summary judgment, Judge Drain found that NPI had

accepted the goods and was thus liable to Walgreen for the cost of the goods.  (*See* Oct. 15, 2012

Hr'g Tr. 79–81 (Dkt. No. 133, No. 11-AP-8367 Dkt.).)

Around the same time, Walgreen received complaints from customers regarding a Private

Label Product called Advance Joint Relief ("AJR").  (*See* N21 Br. 11; *see also* NPI Br. 13–14.)

Walgreen demanded that NPI agree to a recall of AJR products, at NPI's expense.  (*See* N21 Br.

4

11; Minger Decl. ¶¶ 56–58; NPI Br. 13–14.)  According to Scott Minger ("Minger"), the

Walgreen manager responsible for Walgreen's relationship with NPI, NPI "refused to accept

responsibility for the recalled AJR," and "NPI's refusal to compensate Walgreen[] for the[]

defective [AJR] led to the termination of NPI as a vendor."  (*See* Minger Decl. ¶¶ 2, 57–58.)

    B.  Procedural History

        On May 24, 2011, Walgreen filed suit against N21 and NPI in the United States District

Court for the Northern District of Illinois, seeking to collect approximately $1.6 million

allegedly owed to it for damaged, recalled, and out-of-date products sold by N21 and NPI.  (*See*

Compl. (Dkt. No. 1, No. 11-CV-3493 (N.D. Ill.) Dkt.).)  On July 14, 2011, N21 answered and

filed both a counterclaim against Walgreen and a cross-claim against NPI.  (*See* Answer,

Counterclaim, and Cross-Claim (Dkt. No. 14, No. 11-CV-3493 (N.D. Ill.) Dkt.).)  N21's

counterclaim sought payment from Walgreen for outstanding invoices, and its cross-claim sought

indemnification from NPI pursuant to APA § 1.3(a).  (*Id.* ¶¶ 43–51.)  On August 31, 2011, NPI

filed its own answer and counterclaim against Walgreen for unpaid invoices, (*see* Answer and

Counterclaim (Dkt. No. 33, No. 11-CV-3493 (N.D. Ill.) Dkt.)), and on November 30, 2011, filed

an answer and counterclaim against N21 alleging claims for fraud, rescission, breach of contract,

indemnification, breach of the implied covenant of good faith and fair dealing, breach of the

implied warranty of merchantability, violation of Florida's Deceptive and Unfair Trade Practices

Act, and attorneys' fees, (*see* Answer and Counterclaim (Dkt. No. 5, No. 11-AP-8367 Dkt.)).

Shortly thereafter, N21 filed an amended answer, counterclaim, and cross-claim on December 6,

2011, (*see* Am. Answer, Counterclaim, and Cross-Claim (Dkt. No. 11, No. 11-AP-8367 Dkt.)),

and on December 20, 2011, NPI filed its own amended answer and counterclaims, (*see* Am. Answer and Counterclaim (Dkt. No. 14, No. 11-AP-8367 Dkt.)).

In the midst of the filing of these various pleadings, on August 26, 2011, N21 filed a voluntary petition pursuant to Chapter 11 in the Bankruptcy Court for the Southern District of New York.  (*See* Voluntary Pet. (Dkt. No. 1, No. 11-BK-23712 Dkt.).)  As a result, the existing suit between the Parties was transferred to Judge Drain.  (*See* Stipulation and Order (Dkt. No. 1, No. 11-AP-8367 Dkt.).)[2]

By Order dated November 26, 2012, the bankruptcy court granted partial summary judgment on the Parties' summary judgment motions, for the reasons stated on the record at an October 15, 2012 hearing.  (*See* Am. Mem. of Decision After Trial ("Order") 3 (Dkt. No. 204, 11-AP-8367 Dkt.).)  Specifically, Judge Drain ruled "(1) in favor of Walgreen against NPI in the amount of $1,260,549.02, comprising (a) the so-called 'authorized return' of five 'branded' products by Walgreen to NPI in the amount of $1,179,5[9]9.02, and (b) a related authorized price reduction of $80,950, and (2) in favor of Walgreen against NXXI for chargebacks in the amount of $156,839.57 based on Walgreen's reason codes 'DDLS, DCOU, PA, and SVCL' (deals, coupons, price adjustments based on audit[,] and miscellaneous store claims), which were not contested by NXXI."  (*Id.*; *see also* Order on Walgreen Co.'s Mot. for Partial Summ. J. (Dkt. No. 134, No. 11-AP-8367 Dkt.).)[3]

---

[2] The Court notes that the case had, in the interim, been transferred to Judge Sand in the Southern District of New York.  (*See* Dkt. Nos. 43–44 (11-CV-7237 Dkt.).)

[3] In a later order, Judge Drain also granted partial summary judgment in favor of N21, dismissing Walgreen's claim against it for the same $1,260,549.02 in "authorized returns" and "related authorized price reduction" described above.  (Order 4.)  Judge Drain concluded that the

After a bench trial, the bankruptcy court issued a Memorandum of Decision addressing the remaining claims on May 28, 2014.  (*See* Order.)[4]  Relevant to this appeal, and as will be discussed in greater detail below, Judge Drain held that:  (1) NPI was liable to N21 for $155,445.10 in chargebacks for which the bankruptcy court had held N21 liable to Walgreen, based on § 1.3(a) of the APA, (Order 17–18); (2) NPI's breach of contract claims failed because NPI did not establish that any damages were proximately caused by the alleged breaches and alternatively because NPI did not prove its alleged damages with reasonable certainty, (*id.* at 21–25); (3) NPI waived its fraud and rescission claims, (*id.* at 7); and (4) N21 was not entitled to attorneys' fees and expenses pursuant to § 10.2 of the APA, (*id.* at 19).  NPI filed a Notice of Appeal, dated July 25, 2014, (*see* Dkt. No. 1), and N21 followed with its own Notice of Cross-Appeal, dated August 4, 2014, (*see* Dkt. No. 2).[5]  In its Statement of Issues on Appeal, dated September 5, 2014, NPI presented 17 issues, some of which were mooted by NPI's settlement with Walgreen and some of which were not pressed in NPI's briefing.  (*See* Statement of Issues (Dkt. No. 3).)

NPI principally presents three questions on appeal:  (1) "[w]hether the trial court erred by not applying the limitation of liability to post-closing sales in APA [§] 1.3(a), when it ruled that

---

amounts were "separately bargained between Walgreen and NPI and that the 'authorized return' was made to NPI, not to NXXI."  (*Id.*)

[4] The original Memorandum of Decision, dated May 28, 2014, was amended on July 2, 2014 to correct a mathematical error.  (*See* Order 1 n.1.)

[5] On November 4, 2014, NPI notified the Court that it had reached a settlement with Walgreen, and the Court so ordered a Stipulation of Settlement the following day.  (*See* Dkt. Nos. 24–25.)

NPI assumed, for NXXI's benefit, all of Walgreen's post-APA chargebacks against NXXI for pre-closing sales, and instead only applied the limitation to the last antecedent in the list"; (2) "[w]hether the trial court erred in finding that NPI did not offer sufficient evidence to show that NXXI's alleged breaches of the APA proximately caused NPI's claimed damages"; and (3) "[w]hether the trial court erred in ruling that NPI waived its fraud and rescission claims against NXXI with respect to the APA." (NPI Br. 1.) N21, in its cross-appeal, presents one question: "[w]hether the [c]ourt below was correct in dismissing N21's claim against NPI for attorneys' fees and expenses pursuant to the APA, when N21 had demanded such attorneys' fees and expenses within the time provided for in the APA, and N21's failure to obtain a letter from its counsel to the effect that a conflict of interest between N21 and NPI (which clearly existed) precluded the same attorneys from representing both companies, was not material." (N21 Br. 2; *see also* Counterstatement of the Issues (Dkt. No. 5).)

On November 4, 2014, NPI filed its brief in support of its appeal. (*See* Dkt. No. 23.) On November 21, 2014, N21 filed its brief in support of its cross-appeal and in opposition to NPI's appeal. (*See* Dkt. No. 26.) NPI filed its brief in further support of its appeal and in opposition to N21's cross-appeal on December 8, 2014. (*See* Dkt. No. 27.) N21 filed its brief in further support of its cross-appeal on December 19, 2014. (*See* Dkt. No. 28.)

## II.  Discussion

### A.  Standard of Review

District courts have jurisdiction to review final bankruptcy orders under 28 U.S.C. § 158(a)(1). *See In re Firstcent Shopping Ctr., Inc.*, 141 B.R. 546, 550–51 (S.D.N.Y. 1992); *In re Rebeor*, 89 B.R. 314, 320 (Bankr. N.D.N.Y. 1988). A district court reviews a bankruptcy

court's findings of fact for clear error and reviews conclusions of law de novo.  *Lubow Mach. Co. v. Bayshore Wire Prods. Corp.* (*In re Bayshore Wire Prods. Corp.*), 209 F.3d 100, 103 (2d Cir. 2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, [and] its conclusions of law de novo . . . ." (citations and italics omitted)); *Am. Home Assurance Co. v. Enron Nat. Gas Mktg. Corp.* (*In re Enron Corp.*), 307 B.R. 372, 378 (S.D.N.Y. 2004) ("A bankruptcy court's conclusions of law are reviewed de novo and its findings of fact for clear error." (italics omitted)).

Under the clear error standard, "[t]here is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been committed."  *Travellers Int'l A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (first alteration in original) (internal quotation marks omitted); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) ("[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (internal quotation marks omitted)); *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003) (stating that an appellate court should not overturn a trial judge's choice "between permissible competing inferences").  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Travellers Int'l*, 41 F.3d at 1574–75 (internal quotation marks omitted); *see also UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015) (same); *In re CBI Holding Co.*, 419 B.R. 553, 563 (S.D.N.Y. 2009) ("In reviewing findings for clear error, [an appellate court] is not allowed to second-guess . . . the trial court's . . . choice

between competing inferences.  Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous." (alterations in original) (internal quotation marks omitted)).

> B.  Analysis

> > 1.  NPI's Assumption of Chargeback Liability

The bankruptcy court found NPI liable to N21, under APA § 1.3(a), for Walgreen's chargebacks against N21, an amount totaling $155,445.10.  (Order 17–18.)[6]  NPI contends that the bankruptcy court erred when it interpreted APA § 1.3(a) to require NPI to assume liability for *all* of Walgreen's chargebacks, including the post-APA chargebacks.  The relevant language of the APA reads as follows:

> Assumption of Liabilities.  The Buyer shall assume (i) the Seller's trade accounts payable for the Business as of the Closing, specifically excluding payables which are subject to litigation against the Seller, (ii) present and future obligations of Seller under the Assigned Contracts, (iii) and *any existing or future claims by retailers for returns and allowances, charge backs, "unsalables" and promotional allowances, or equivalent deductions or charges however called, whether known on [sic] unknown* and (iv) any future product liability claims in respect of any Product sold by Buyer after Closing excluding sale of Seller's existing Inventory sold and delivered to Buyer hereunder (collectively "Assumed Liabilities"). . . .

(APA § 1.3(a) (emphasis added).)  NPI takes the position that the exclusionary phrase in clause (iv)—"excluding sale of Seller's existing Inventory sold and delivered to Buyer hereunder" (the

---

[6] The bankruptcy court found that NPI was liable to N21 for $155,445.10 in chargebacks. (*See* Order 17, 27.)  Those chargebacks were divided into two categories:  (1) $16,709.97 of "agreed deal" chargebacks and (2) $138,735.13 in "post-APA chargebacks."  (*Id.* at 17.)

"Limiting Phrase")—applies to the assumption of chargebacks in clause (iii) and so it cannot be held liable for the $155,445.10 in chargebacks.  (*See, e.g.*, NPI Br. 9–11.)[7]

The bankruptcy court, on the other hand, concluded that the Limiting Phrase applied only to clause (iv) and not clause (iii) for three reasons.  First, "[t]he word 'and' commencing clause (iii) of APA [§] 1.3(a) makes it clear that the exclusion appearing at the end of clause (iv) [of] APA [§] 1.3(a) applies only to that clause, which is introduced by its own 'and.'"  (Order 17–18.)  Second, under the "'last antecedent' rule," the Limiting Phrase applies only to the clause immediately preceding it, not the earlier clauses.  (*Id.* at 18.)  And third, the Limiting Phrase could not apply to the types of liabilities assumed in clauses (i) and (ii).  (*Id.*)[8]

The Court is guided by the general principle that "[u]nless ambiguous, contract language must be given its plain meaning."  *Grove at Harbor Hills Homeowners v. Harbor Hills Dev., L.P.*, 158 So.3d 611, 612 (Fla. Dist. Ct. App. 2005); *see also Crawford v. Barker*, 64 So.3d 1246, 1255 (Fla. 2011) ("Where the terms of a contract are clear and unambiguous, the parties' intent

---

[7] It is unclear whether NPI argues that its reading of § 1.3(a) would absolve it of liability for *all* $155,445.10, including the "agreed deal" chargebacks, as opposed to only the post-APA chargebacks.  This uncertainty is ultimately irrelevant, as the Court rejects NPI's interpretation of the provision.

[8] Judge Drain also noted that Minski, NPI's primary negotiator of the APA, "testified that the chargebacks assumed by NPI under [§ 1.3(a)] included chargebacks for inventory sold to NPI under the APA."  (Order 18 n.53.)  However, the testimony cited actually states that NPI "assume[d] the responsibility for any claimed chargebacks or deductions coming through after the closing for goods sold *to customers* by Nutrition 21."  (Deposition of Jose Minski 48 (emphasis added) (Dkt. No. 156, 11-AP-8367 Dkt.).)  Even if true, this does not necessarily preclude NPI's reading of § 1.3(a), which would only exclude from the assumption of liability chargebacks resulting from products received under the APA and sold to customers *by NPI*.

must be gleaned from the four corners of the document.").[9]  "A contract is ambiguous when it is susceptible to more than one reasonable interpretation, but where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner."  *CitiMortgage, Inc. v. Turner*, 172 So.3d 502, 504 (Fla. Dist. Ct. App. 2015) (internal quotation marks omitted).

At the outset, it bears noting that NPI's position on the correct interpretation of § 1.3(a) shifts from one brief to the next.  In its opening brief before this Court, NPI appears to argue that the Limiting Phrase applies to clauses (ii) through (iv).  (*See* NPI Br. 11 ("[W]hen considering timeframe as an alternative indicia of meaning, the limiting phrase very sensibl[y] modifies clauses (ii)–(iv), all of which deal with existing and future commercial activity.").)  In its reply brief, NPI does an about-face, at least with respect to the phrase's applicability to clauses (ii) and (iv).  (*See* Appellant's Reply Br. and Resp. Br. ("NPI Reply Br.") 3 (noting that "[i]t is undisputed that the exclusionary clause in subsection (iv) would be meaningless if applied to clause[] (ii)," and would be "equally as meaningless when applied to subsection (iv) alone") (Dkt. No. 27).)  In any event, NPI's final position, as laid out in its reply brief, is that § 1.3(a) requires NPI to assume the following liabilities:

> (i)     Trade accounts payable for the Business as of the Closing, specifically excluding payables which are subject to litigation against [S]eller;
>
> (ii)    Present and future obligations of Seller under Assigned Contracts; and
>
> (iii)   Any (x) existing or future claims by retailers for returns and allowances, charge backs, "unsaleables" [sic] and promotional allowances, or equivalent deductions or charges however called, whether known or unknown,

---

[9] Florida law governs the interpretation of the APA.  (*See* APA § 12.6.)

> *excluding sale of Seller's existing inventory sold and delivered to Buyer hereunder and* (y) any future product liability claims with respect to any Product sold by Buyer after Closing.

(NPI Reply Br. 2–3 (emphasis in original).)  The Court concludes that this is not a reasonable interpretation of the contractual language for a number of reasons.

First, NPI argues that clause (iii) and (iv) are "part of the same element of the series" because "there is no comma after subpart (iii)."  (NPI Br. 9–10.)  In other words, NPI reads the list as "a, b, and c and d."  In this reading, the exclusionary phrase is meant to limit, to the extent applicable, both clause (iii) and (iv) because they comprise a single element.  This reading ignores the fact that the Limiting Phrase follows a separate subclause of § 1.3(a) that itself is separated from the other clauses by its own roman numeral.  While NPI contends that the "roman numerals led the [bankruptcy] court astray," (*id.* at 10), the Court is not as quick as NPI to disregard the fact that two distinct clauses each were given their own roman numerals of the same sequence and level as those preceding it.  Indeed, NPI's own construction of the paragraph, detailed above, presents a useful example as to how a drafter may choose to divide a single element into two subelements by using a second level of sequence markers.  (NPI Reply Br. 2–3 ("(iii) Any (x) existing or future claims by retailers for returns and allowances . . . and (y) any future product liability claims with respect to any Product sold by Buyer after Closing." (emphasis omitted)).)  NPI asks the Court to ignore the roman numeral sequencing as a mistake, but the reasonable reading of the relevant language is that the inclusion of the word "and" at the beginning of subclause (iii) was inadvertent.  Indeed, its inclusion *after* the roman numeral is

clearly mistaken, as it renders the language ungrammatical.  (APA § 1.3(a)(iii) ("The Buyer shall assume . . . and any existing or future claims by retailers . . . .").)

But even if the Court accepted that clauses (iii) and (iv) form a single element, NPI asks the Court to go further and find that the Limiting Phrase applies *only* to (iii) and not to (iv), the subelement that it immediately follows.  (NPI Reply Br. 2–3.)  It is "the duty of the trial court to prevent" "fanciful, inconsistent, and absurd interpretations of plain language" when addressing questions of contractual interpretation.  *BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So.3d 527, 530 (Fla. Dist. Ct. App. 2012); *see also Vyfvinkel v. Vyfvinkel*, 135 So.3d 384, 385 (Fla. Dist. Ct. App. 2014) (same).  The Court cannot endorse an interpretation of the contractual provision that requires the conclusion that the parties to the agreement wished to have the Limiting Phrase apply *only* to clause (iii) of the provision but chose to place it after a subclause that itself is separated from clause (iii) by its own roman numeral.[10]

Moreover, the wording of the Limiting Phrase makes clear that it was not meant to apply to clause (iii).  The Limiting Phrase's reference to the exclusion of "*sale[s]* of [N21's] existing Inventory *sold*," cannot be detached from the immediately preceding portion of clause (iv)

---

[10] According to NPI, the Limiting Phrase can *only* apply to clause (iii) and not clause (iv) because "[t]he meaning of the term 'Product' refers only to product sold under the Iceland Health trademark or that contain fish oil or Omega 3," and that, in light of that definition, application of the Limiting Phrase to clause (iv) makes no sense.  (NPI Reply Br. 1.)  The Court rejects the premise of NPI's argument.  NPI directs the Court to § 9.6 of the APA for the purported definition of "Product."  (*Id.*)  However, just a quick glance at § 9.6 reveals that it is the phrase "Eligible Products," and not "Product," that "means any products that are sold under the Iceland Health trademark or that contain fish oil or omega 3."  (APA § 9.6(a).)  Clearly, this section seeks to define "Eligible Products" as a *subset* of the more general term, "Product."  (*See id.* ("Not later than 60 days after the end of each Accounting Period, Buyer will provide a Net Sales Report to Seller for such Accounting Period *for Products sold . . . that are Eligible Products*." (emphasis added)).)

describing "any Product *sold* by [NPI] after Closing."  NPI's attempt to, in effect, extract the

Limiting Phrase from clause (iv) and plant it after clause (iii) would detach it from the "in

respect of any Product sold" phrase to which it plainly belongs.  Indeed, once pasted into clause

(iii), the sentence no longer makes sense:  "[NPI] shall assume . . . any existing or future claims

by retailers for . . . charge backs . . . , whether known o[r] unknown, excluding sale of [N21's]

existing Inventory sold and delivered to [NPI] hereunder."  Such a reading would require the

Court to supplement the provision with additional words, adding a phrase that references the

underlying sales that could possibly result in chargebacks.  For example, the clause would have

to read, in effect, "Buyer shall assume . . . any existing or future claims by retailers for . . .

charge backs . . . , whether known or unknown, *resulting from sales of any Product*, excluding

sale of Seller's existing inventory sold and delivered to Buyer hereunder" or "Buyer shall

assume . . . any existing or future claims by retailers for . . . charge backs . . . , whether known or

unknown, excluding *those resulting from* sale of N21's existing inventory sold and delivered to

Buyer hereunder."

To address this problem, NPI could (but does not) argue that both the Limiting Phrase

and the phrase "in respect of any Product sold by Buyer after Closing" should *both* be read as

qualifying clause (iii).  Presumably, NPI does not make such an argument because it would

conflict with its contention that the Limiting Phrase cannot follow the phrase "in respect of any

Product sold" due to its erroneous definition of "Product," as discussed above.  However, even if

NPI offered such an argument, the entire phrase "in respect of any Product sold by Buyer after

Closing excluding sale of Seller's existing Inventory sold and delivered to Buyer hereunder"

cannot apply to clause (iii) because it would render that clause's inclusion of

"existing . . . claims" for charge backs meaningless.  *See Resnick v. J. Weinstein & Sons, Inc.*,

163 So.3d 700, 703 (Fla. Dist. Ct. App. 2015) ("Generally, the interpretation of a contract which

gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part

useless or inexplicable." (internal quotation marks omitted)).  There cannot possibly be

"existing . . . claims by retailers for . . . charge backs . . . in respect of any Product sold by Buyer

*after* Closing."  It is clear, therefore, that the Limiting Phrase, whether on its own or in

conjunction with its immediately preceding language, cannot apply to clause (iii).

Lastly, as argued by N21, the Limiting Phrase logically applies to NPI's sale of "existing

Inventory" sold by N21 to NPI under the APA.  (*See* N21 Br. 17.)  The Limiting Phrase is

intended to address the foreseeable possibility that NPI would someday be subject to product

liability claims in connection with the Inventory sold by N21 to NPI under the APA.  *See, e.g.*,

*Hatadis v. Achieva Credit Union*, 159 So.3d 256, 259 (Fla. Dist. Ct. App. 2015) ("Where one

interpretation of a contract would be absurd and another be consistent with reason and

probability, the contract should be interpreted in the rational manner.") (internal quotation marks

omitted)).

Even if the Court was inclined to accept NPI's interpretation as a reasonable one, and

thus find the contract to be ambiguous, rules of grammatical construction would confirm that

N21's interpretation is the correct one.  *See Miller v. Kase*, 789 So.2d 1095, 1098 (Fla. Dist.

App. 2001) ("[R]esort to rules of construction is permissible only where the contractual language

is ambiguous.").  Under the "doctrine of the last antecedent, . . . 'relative and qualifying words,

phrases[,] and clauses are to be applied to the words or phrase immediately preceding, and are

not to be construed as extending to, or including, others more remote.'"  *Kasischke v. State*, 991

So.2d 803, 811 (Fla. 2008) (quoting *City of St. Petersburg v. Nasworthy*, 751 So.2d 772, 774

(Fla. Dist. Ct. App. 2000)); *see also Jacques v. Dep't of Bus. & Prof. Regulation*, 15 So.3d 793,

796 (Fla. Dist. Ct. App. 2009) (same); *Ward v. State*, 936 So.2d 1143, 1147 (Fla. Dist. Ct. App.

2006) (same); *accord Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 335

(2d Cir. 2011) ("Under the 'rule of the last antecedent, . . . a limiting clause or phrase . . . should

ordinarily be read as modifying only the noun or phrase that it immediately follows.'"

(alterations in original) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003))).[11]  The rule

carries particular force where there is no comma after the last of the series and before the

qualifying phrase.  *See Mendelsohn v. State Dep't of Health*, 68 So.3d 965, 967–68 (Fla. Dist. Ct.

App. 2011) ("Based on the rules of grammatical construction, a qualifying phrase will be read as

modifying all items listed in a series *unless there is no comma between the last of the series and

the qualifying phrase*." (emphasis added)); *see also Jacques*, 15 So.3d at 796 ("[A] qualifying

phrase is read as limited to the last item in a series when the phrase follows that item without a

comma."); *accord Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1257 (11th Cir. 2014)

("[W]here the modifier is set off from two or more antecedents by a comma, the supplementary

'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate

to more than the last antecedent." (some internal quotation marks omitted)); *Enron*, 651 F.3d at

335 (describing as a corollary of the "last antecedent" rule, the rule that "a modifier set off from

---

[11] While some of these cases are statutory interpretation cases and not contract cases, this
rule is one of grammar, which applies equally to a statutory or contractual interpretation
question.  "Under ordinary contract construction rules, the rules of English grammar apply.  The
rule of the last antecedent is such a rule."  *In re Enron Creditors Recovery Corp.*, 380 B.R. 307,
322 (S.D.N.Y. 2008); *see also Richland Towers, Inc. v. Denton*, 139 So.3d 318, 323 (Fla. Dist.
Ct. App. 2014) (considering last antecedent rule in context of contractual interpretation analysis).

a series of antecedents by a comma should be read to apply to each of those antecedents" (alterations and internal quotation marks omitted)).

Here, there is no comma after clause (iv) and before the Limiting Phrase.  *See* APA § 1.3(a) ("The Buyer shall assume . . . (iv) any future product liability claims in respect of any Product sold by Buyer after Closing excluding sale of Seller's existing Inventory sold and delivered to Buyer hereunder . . . .").  Accordingly, the "last antecedent" rule provides additional support for the conclusion that the Limiting Phrase applies only to clause (iv), its immediately preceding clause, and not clause (iii), the clause governing NPI's assumption of liability for the chargebacks at issue.  (*See* Order 18.)

As NPI rightfully points out, (*see, e.g.*, NPI Br. 10), the "last antecedent" rule "is not inflexible and uniformly binding," and should not be applied where a "contrary intention appears" in the subject language, *Kasischke*, 991 So.2d at 811–12 (internal quotation marks omitted).  But, as discussed above, the Court finds none of NPI's arguments supposedly demonstrating such a contrary intention to be persuasive.  Accordingly, NPI remains liable to N21 for the $155,445.10 in chargebacks.

### 2.  NPI's Breach of Contract Claim

NPI argued before the bankruptcy court that N21 breached various representations and warranties in the APA and that, accordingly, any obligation that it has to N21 under APA § 1.3(a) is therefore offset by its damages suffered as a result of those breaches.  NPI identified the following representations and warranties as those allegedly breached by N21:

- Section 2.13:  <u>Customers and Suppliers; Warranties</u>.  Seller's relations with its customers and suppliers are good and there are not pending or, to Seller's knowledge, threatened claims or controversies with any customer or

suppliers that are material to the Assets or the Business or reasonably can be deemed to pose a risk of resulting in a Material Adverse Effect.  The products of the Business have the warranties listed on Schedule 2.13 hereto. Also set forth on Schedule 2.13 hereto is, to the best knowledge of Seller, a list of existing or future claims by retailers for returns and allowances, charge backs, "unsalables" and promotional allowances, or equivalent deductions or charges of any nature.

- Section 2.14:  Inventory.  The Inventory is merchantable and fit for the purpose for which it was procured or manufactured and none of which is damaged, or defective.  No material supplier of the Seller has indicated any intention to not continue its business relations with Seller or Buyer as a result of the transaction contemplated hereby or otherwise.

- Section 2.18:  Disclosure.  The representations, warranties and statements contained in this Agreement and in the certificates, exhibits, and Schedules delivered by Seller to Buyer pursuant to this Agreement do not contain any untrue statement of a material fact, and, when taken together, do not omit to state a material fact required to be stated therein or necessary in order to make such representations, warranties or statements not materially misleading in light of the circumstances under which they were made. There are no facts known to Seller about the Business or Assets which presently or would in the future have a Material Adverse Effect which have not been specifically disclosed herein or in a Schedule furnished.

(See NPI's Proposed Findings of Fact and Conclusions of Law ("NPI Conclusions of Law") 21–24, 27–28 (Dkt. No. 177, 11-AP-8367 Dkt.); APA §§ 2.13, 2.14, 2.18.)[12]

Both before the bankruptcy court and on this appeal, NPI described the damages resulting from N21's alleged breaches as follows:

NPI . . . suffered the following damages as a proximate and reasonably foreseeable consequence of N21's breaches of warranty:

---

[12] NPI also referred to breaches of APA § 6.1, which merely required that all representations and warranties made by N21 would remain true as of the closing of the transaction.  (See APA § 6.1.)  As noted, the deal closed the same day it was signed.  (See id. § 1.4.)

- But for N21's breach of [§§] 2.13, 2.18 and 6.1, NPI would not have paid for $209,717.88 in accounts receivable if N21 had not misrepresented the value of unapplied Walgreen's [c]hargebacks as [$0], when the value of those pending chargebacks was actually $209,469.75;

- But for N21's breach of [§§] 2.13, 2.14, 2.18 and 6.1, the products sold by N21 would not have been defective, and Walgreen would not have terminated its business relationship with NPI due to a recall of the AJR product; and

- But for N21's breach of [§§] 2.13, 2.14, 2.18 and 6.1, NPI would not have been left with $1,002,168.50 in unsalable inventory that can no longer be sold to Walgreen because of N21's breaches.

(NPI Reply Br. 14.)  Setting aside for the moment the $209,717.88 sought for undisclosed pending chargebacks, Judge Drain concluded that the remaining damages sought by NPI allegedly flowed from Walgreen's termination of NPI.  (Order 20–21.)[13]  Accordingly, Judge Drain found that, to establish its purported damages against N21, NPI "had to prove by a preponderance of the evidence that NXXI's alleged breach was the proximate cause of NPI's ceasing to do business with Walgreen, or, more accurately, that it was the proximate cause of the failure of NPI and Walgreen to enter into a long-term relationship."  (*Id.* at 21.)  Judge Drain concluded that NPI failed to establish proximate cause because the evidence showed that NPI and Walgreen failed to enter into a long-term business relationship for "two primary reasons," neither of which was related to any alleged breach by N21.  (*Id.* at 22.)

---

[13] This is so with respect to the $1,002,168.50 in unsalable inventory because NPI argued that the inventory was unsalable not because it was defective but "because it could not be sold after NPI ceased doing business with Walgreen."  (Order 21; *see also* NPI Reply Br. 14 ("But for N21's breaches . . . NPI would not have been left with $1,002,168.50 in unsalable inventory that can no longer be sold to Walgreen . . . .").)

First, one of NPI's competitors, HPF, was prepared to pay Walgreen over $1.2 million for the product Walgreen sought to recall, and an additional $1.05 million for the opportunity to essentially replace NPI as exclusive seller of the products N21 and then NPI had sold Walgreen. (*Id.*; *see also* N21 Br. 11–12.)  Second, NPI and Walgreen's negotiations related to the AJR recall "broke down primarily over NPI's insistence that Walgreen agree to a long-term guaranteed volume of sales."  (*Id.* at 22–23.)[14]  Finding that NPI failed to establish that N21's alleged breaches caused the damages sought by NPI, Judge Drain determined that the issue of whether N21 actually breached the APA was moot.  (*See* Order 25–26.)

On appeal, NPI argues that "problems with the defective soft gel products produced by N21 . . . were a substantial cause of Walgreen['s] decision to terminate its new business relationship with NPI."  (NPI Br. 12.)  The most direct formulation of NPI's argument can be found in its opening brief before this Court:

> The record clearly reflects that N21 had a history of selling leaking or defective soft gel caps to Walgreen[].  The defective soft gel product damaged N21's relationship with Walgreen[].  N21 represented and warranted in the APA to the contrary.  NPI was induced by said representations and warrant[ie]s to consummate the APA.  But, when NPI attempted to make good on the relationship with Walgreen[], NPI found that . . . *N21's history of selling defective soft gels had irreparabl[y] damaged its ability to develop a long-term relationship with Walgreen*.  Walgreen decided to replace [NPI].  Accordingly, N21's breaches of the APA representations and warranties vis-à-vis Walgreen and the quality of its product was a proximate cause of the failure of NPI and Walgreen[] to enter into [a] long-term business relationship.

(*Id.* at 14 (emphasis added).)  In support of this argument, NPI cites to a host of evidence detailing the "poor history of product quality that was a proximately [sic] cause of NPI's

---

[14] On the other hand, HPF "was prepared to pay more than $2.25 million to Walgreen merely for the right to be Walgreen's exclusive supplier based on current ordinary course levels of demand."  (Order 23.)

inability to develop a long-term relationship with Walgreen[]."  (*Id.* at 12–13.)  The vast majority of the evidence relied upon by NPI relates to the time period prior to the execution of the APA. (*See id.*)  For example, NPI notes that Walgreen experienced "chronic quality control issues" with N21 products as early as October 2008, and that, in early 2009, Walgreen received complaints and discovered that N21's soft-gel products leaked, causing Walgreen to put N21 on probation and inform N21 that it was "killing" its "brand equity" with its quality issues.  (*Id.* (internal quotation marks omitted).)

Post-APA, NPI points to evidence that NPI received customer complaints from Walgreen's customers about leaking soft-gel products, which caused Walgreen to ask NPI to formally investigate the problem.  (*Id.* at 13.)[15]  Finally, NPI argues that quality problems with the soft-gel products "caused Walgreen to issue a recall of that product in the Spring of 2010." (*Id.* at 13–14.)  When NPI refused to approve a return of the recalled product, "Walgreen[] then terminated NPI as a vendor."  (*Id.* at 14.)

Thus, at bottom, the Court interprets NPI's argument as seeking to establish breach and causation one of two ways.  First, NPI asserts that, under § 2.13 of the APA, N21 warranted and represented that its relations with customers were good and that there were no pending or threatened claims or controversies with any customers.  However, as demonstrated by the above pre-APA evidence, NPI argues that N21's relationship with Walgreen was anything but good— there had been complaints about product quality and Walgreen had even put N21 on probation for a period and informed N21 that it was killing its brand equity with quality issues.  And if

---

[15] NPI notes that Minski informed the manufacturer of the leaking soft-gel products that NPI found leakers in multiple lots of the product.  (*See* NPI Br. 13.)

N21's warranty was actually accurate, and these ill feelings between the two did not exist, or as NPI puts it, if N21 had not "poisoned the well" with Walgreen, (*see* NPI Br. 15), then NPI would not have been terminated by Walgreen. The breach of § 2.13, therefore, resulted in NPI's inability to create a long-term relationship with Walgreen.

Second, NPI asserts that, under § 2.14, N21 warranted and represented that the Inventory covered by the APA was free from defects. However, according to NPI, N21 had been consistently producing defective products, including those that were eventually the subject of a recall request by Walgreen. If N21 did not breach § 2.14, meaning their products were not defective, Walgreen would not have sought to recall any products and would not have terminated its relationship with NPI after NPI refused to repurchase the defective product. The breach of § 2.14, therefore, resulted in NPI's inability to create a long-term relationship with Walgreen.

Both theories fail. "A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach." *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784 (11th Cir. 1999); *see also Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344 (S.D. Fla. 2006) ("Under Florida law, recoverable damages include all damages which are a natural, proximate, probable[,] or direct consequence of the act, but do not include remote consequences." (internal quotation marks omitted)), *aff'd*, 294 F. App'x 501 (11th Cir. 2008); *Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) ("Under Florida law, . . . [the plaintiff] must prove that the damages it claims to have suffered were *proximately* caused by the breach." (emphasis in original)); *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.*, 25 So.3d 593, 596 (Fla.

Dist. Ct. App. 2009) ("The injured party is entitled to recover all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract."); *Stensby v. Effjohn Oy Ab*, 806 So.2d 542, 544 (Fla. Dist. Ct. App. 2001) ("It is of course established that a breach-of-contract-plaintiff must show that the defendants' breach was a 'substantial factor' in causing damage.").

NPI's contention that the pre-APA hiccups in the relationship between N21 and Walgreen—generally caused by questionable product quality—"irreparabl[y] damaged its ability to develop a long-term relationship with Walgreen," (NPI Br. 14), is belied by the evidence, which instead pinpoints a specific series of events—Walgreen's AJR recall and NPI's refusal to accept the costs of the recall without Walgreen's guarantee of long-term volumes—as the catalyst for Walgreen's termination of NPI as a vendor. *See Goldberg v. Fla. Power & Light Co.*, 899 So.2d 1105, 1116 (Fla. 2005) (noting that a breaching defendant "is not liable for damages suffered by an injured party when some separate force or action is the active and efficient intervening cause of the injury." (internal quotation marks omitted)); *see also Tardif v. People for the Ethical Treatment of Animals*, 829 F. Supp. 2d 1219, 1233 (M.D. Fla. 2011) (same).[16] Specifically, Minger, the Walgreen manager responsible for Walgreen's relationship with NPI, testified that around March or April 2010, Walgreen "recalled a Private Label Item, Finest Natural Advanced Joint Relief," and "requested that NPI accept responsibility for the

---

[16] Although the *Goldberg* case "refers only to negligence claims," the proximate cause principles espoused in that case and other negligence cases "are also applicable to breach of contract claims." *Tardif*, 829 F. Supp. 2d at 1233; *cf. Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839–40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well.").

cost of th[e] recall." (Minger Decl. ¶¶ 56–57.) He further explained that "NPI refused to accept responsibility for the recalled AJR" and that "NPI's refusal to compensate Walgreen[] for these defective products *led to the termination of NPI as a vendor*." (*Id.* ¶¶ 57–58 (emphasis added).) Moreover, as pointed out by Judge Drain, the negotiation over the recall compensation broke down when NPI predicated its compensation of Walgreen for the recalled AJR on the condition that Walgreen agree to a long-term guaranteed volume of sales. (*See* Trial Tr. 151.) As Minger testified, he "had *every intention and every desire* to keep the business within NPI and we were very close to an agreement," but "[a]t the end of the day, we couldn't agree to guarantee certain volumes." (*Id.* (emphasis added).) Only when NPI and Walgreen could not come to an agreement on guaranteed volumes of sales, and thus could not come to an agreement on the AJR recall, did the business relationship between the two come to an end. Before that, "it was absolutely [Minger's] desire to keep that business with NPI," (*id.*), this, apparently, in spite of the allegedly sour pre-APA relationship between N21 and Walgreen. Ultimately, the decisive role played by the events surrounding the AJR recall in Walgreen's decision to terminate NPI fatally undercuts NPI's claim that it was the fact that N21's relations with Walgreen were not "good," (*see* APA § 2.13), or that it was the "damage N21 had done to its relationship with Walgreen prior to the [APA]," (NPI Reply Br. 10), that caused Walgreen to terminate NPI as a vendor. In short, the bankruptcy court's finding that N21's allegedly bad relations with Walgreen did not *cause* the AJR recall was not clearly erroneous.[17]

---

[17] For example, in its briefing before Judge Drain, NPI argued that "[N21's] deteriorating relations with Walgreen[] over the defective products eventually resulted in Walgreen[] issuing a national recall of the AJR product." (*See* NPI Conclusions of Law 21.) This illustrates the flaw in NPI's argument. NPI does not explain how "deteriorating relations" spurred Walgreen to

NPI's clearest route to establishing breach and causation would be if it could establish that, at the time of the APA, the AJR recall issue—which led to the end of NPI's relationship with Walgreen—had already presented itself as a "threatened claim[] or controvers[y] with a[] customer" that N21 failed to disclose as required by § 2.13.  However, this effort would fail because, while there were "certainly complaints" about the AJR before the APA, Minger testified "it didn't come to an extent where [Walgreen] [was] going to have to recall it until after [the APA was signed]."  (Trial Tr. 131–32.)[18]

Second, to the extent NPI attempts to argue that N21's alleged breach of § 2.14 contributed to the AJR recall and thus caused the termination of the Walgreen-NPI relationship, NPI ignores that N21's warranty in § 2.14 related to the quality of its products addresses *only* "Inventory," as that term is defined by the APA.  (*See* APA § 2.14 ("The Inventory is

---

recall the AJR product.  NPI does not point to any evidence demonstrating that, for example, those at Walgreen responsible for the N21/NPI relationships discussed and decided that, based on the past issues present in its relationship with N21, Walgreen had to recall the AJR.  Rather, the issue was that Walgreen was in possession of defective product, issued a recall, and NPI refused to pay.  To be sure, if N21 had warranted that it never sold defective product to Walgreen or that, as far as it was aware, no customer was in possession of any defective product, then the recall issue more directly would have been caused at least in part by N21's breach of that representation.  But that is not what N21 warranted.  N21 warranted good relations, and even if there were bad relations, NPI does not point to evidence demonstrating that Walgreen's decision to recall the AJR was based on concerns it had about its past relations with N21 as opposed to NPI's refusal to pay for the recall.

[18] Additionally, N21's director of manufacturing, Steven Sundell, testified that he recalled no AJR complaints after May 2009, (Trial Tr. 546–47, 574–75), and Judge Drain found that Sundell "credibly denied that NXXI had 'ongoing, persistent quality problems with . . . AJR from October 2008 up through the sale pursuant to the APA on December 29, 2009," and that any problems between N21 and Walgreen with respect to AJR were typical of products with similar sales.  (Order 13 (alteration omitted) (quoting Trial Tr. 548–49) (citing Trial Tr. 557, 561, 568).)

merchantable . . . and none of which is damaged, or defective.").)  Thus, that term includes only "inventory being sold []under [the APA]."  (*Id.* § 1.1(a).)  NPI points to no evidence establishing that the AJR subject to the recall was product that was sold from N21 to NPI as Inventory under the APA.  Indeed, NPI's investigation of the AJR that ultimately led to its recall—which was not admitted against N21 (*see* Trial Tr. 145; Order 13)—specifically notes that "th[e] product was sold to Walgreen by Nutrition 21," (*see* TE 35), which renders highly unlikely the possibility that the recalled AJR qualified as "Inventory" subject to the warranty in § 2.14.  N21 could not have transferred it to NPI as part of the APA if it had already sold the product to Walgreen.  So even if N21 breached § 2.14 and included defective products within its Inventory transferred to NPI, NPI has not established that such a breach caused Walgreen to terminate its relationship with NPI because there is no evidence that those defective products were part of the recall of AJR that ultimately led to the termination of NPI.

Accordingly, because NPI did not establish that N21's alleged breaches caused Walgreen to terminate its relationship with NPI, the bankruptcy court's decision denying NPI's breach of contract claim is affirmed.[19]

---

[19] As noted by the bankruptcy court, N21's net claim against Walgreen was large enough so that the $209,717.88 sum representing Walgreen accounts receivable that NPI received pursuant to the APA was paid by Walgreen to NPI.  (Order 21 n.60; *see also id.* at 6 ("Walgreen . . . conceded . . . that it owes NPI for unpaid invoices, before chargebacks, aggregating $908,763.96 ($699,046.08 of post-APA open invoices plus $209,717.88 of Walgreen accounts receivable purchased by NPI from NXXI under the APA.").)  Accordingly, NPI cannot show any damages resulting from its purchase of $209,717.88 of Walgreen accounts receivable, and its breach of contract claim premised on N21's breach of representations that induced the purchase of those accounts receivable must be denied.

### 3.  Fraud and Rescission Waiver

Lastly, NPI appeals the bankruptcy court's "ruling that NPI waived its fraud claim against NXXI as well as its rescission claim against NXXI with respect to the APA."  (Statement of Issues 2.)  The bankruptcy court found a waiver of these claims based on the following statements of NPI's counsel during post-trial oral argument:  (1) "[W]e do elect our remedy of breach of contract and not fraud in this case on behalf of [NPI]," (Trial Tr. 957), and (2) "Rescission is off the table now," (*id.* at 981).[20]  In its reply brief, NPI apparently concedes the waiver, but re-characterizes it as more akin to an election-of-remedies.  (*See* NPI Reply Br. 5 (asserting that "[w]hether NPI technically waived its fraud and recessions [sic] claim is not important because trial counsel merely substituted one theory of damages for another").)  Regardless, as the bankruptcy court found, NPI clearly and expressly abandoned its fraud and rescission claims.  *See Klein v. Rittenband*, No. 09-CV-2019, 2009 WL 3839417, at *3 n.5 (E.D.N.Y. Nov. 17, 2009) (noting that, "[a]t oral argument[,] [the plaintiff] expressly waived any claim to actual damages"); *see also LaPointe v. Winchester Bd. of Educ.*, 366 F. App'x 256, 258 (2d Cir. 2010) ("We decline to consider [the plaintiff's] First Amendment and substantive due process claims on appeal because his attorney explicitly waived those claims . . . during oral argument before the district court.").

---

[20] Counsel's first statement with respect to the fraud claim was made in response to N21's counsel's statement that it was "not clear to [him], whether a claim of fraud is still on the table" in the case.  (Trial Tr. 943.)

### 4.  Attorneys' Fees

On cross-appeal, N21 contends that the bankruptcy court erred when it dismissed N21's claims against NPI for attorneys' fees and expenses pursuant to the APA.  (*See* N21 Br. 2, 24–32.)  In relevant part, under the APA, NPI agreed to indemnify N21

> at all times against and in respect of all losses, liabilities, obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, costs and expenses (including the reasonable fees, disbursements and expenses of attorneys and consultants), of any kind or nature whatsoever, to the extent sustained, suffered or incurred by or made against any Seller Indemnified Party, to the extent based upon, arising out of or in connection with . . . any breach of any covenant or agreement made by [NPI] in [the APA] or in any Schedule, exhibit, certificate, agreement or other instrument delivered by or binding upon [NPI] pursuant to [the APA].

(APA § 10.2.)  The bankruptcy court concluded that N21 was not entitled to attorneys' fees and expenses because it failed to demonstrate compliance with certain provisions of the APA pertaining to its right to such fees and expenses.  (*See* Order 18–19.)  Specifically, Judge Drain found that (1) N21 did not establish by a preponderance of the evidence that it "made a written claim for such indemnification before the second anniversary of the December 29, 2009 closing date under the APA, as required by APA [§] 10.3," and (2) N21 did not introduce any evidence of an opinion by its counsel that there was a conflict of interest between NPI and N21 or that there were specific defenses available to N21 that were not available to NPI, rendering it inappropriate for counsel for NPI to represent N21 in the litigation of Walgreen's chargeback claims, as required by APA § 10.4(b).  (*Id.* at 19.)

Before reaching the procedural grounds on which Judge Drain rested his decision, the Court first addresses whether the indemnity provision of the APA covers the claims at issue in

this case.[21]  "Indemnity contracts are subject to the general rules of contractual construction; thus an indemnity contract must be construed based on the intentions of the parties." *Dade Cty. Sch. Bd. v. Radio Station WQBA*, 731 So.2d 638, 643 (Fla. 1999); *see also Sch. Bd. of Broward Cty. v. Pierce Goodwin Alexander & Linville*, 137 So.3d 1059, 1067 (Fla. Dist. Ct. App. 2014) (same). Accordingly, "[t]he terms of the contract determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim." *Fidelity & Guar. Ins. Co. v. Ford Motor Co.*, 707 F. Supp. 2d 1300, 1313 (M.D. Fla. 2010).  As is the case here, "[a]n indemnity provision must be construed strictly in favor of the indemnitor when such provision is not given by one in the insurance business but is given as an incident to a contract, the main purpose of which is not indemnification." *Bodon Indus., Inc. v. Brown*, 645 So.2d 33, 36 (Fla. Dist. Ct. App. 1994); *see also Barton Marlow Co. v. Grunau Co.*, 835 So.2d 1164, 1167 (Fla. Dist. Ct. App. 2002) ("[W]hen the main purpose of the contract at issue is not indemnification . . . the indemnity provisions must be construed strictly in favor of the indemnitor.").

As N21 explains, it hired legal counsel both to defend itself against Walgreen's chargeback claims and to cross-claim against NPI (and then defend against NPI's counterclaims).  (*See* N21 Br. 25.)  The Court concludes that costs and attorneys' fees associated with neither set of claims falls within the terms of the APA's indemnity provision.  NPI was

---

[21] "In reviewing the decision of a bankruptcy court, a district court, acting as an appellate court, follows the traditional standards of appellate review," *In re Coronet Capital Co.*, No. 94-CV-1187, 1995 WL 429494, at *3 (S.D.N.Y. July 20, 1995), and so the Court may "affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below," *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010); *see also In re Quebecor World (USA) Inc.*, 480 B.R. 468, 479 (S.D.N.Y. 2012) (affirming the bankruptcy court "for different reasons" than those relied upon by the bankruptcy court).

required to "indemnify, defend and hold harmless" N21 for losses, including costs and attorneys'
fees, "to the extent based upon, arising out of or in connection with . . . *any breach* of any
covenant or agreement made by [NPI] in [the APA]."  (APA § 10.2 (emphasis added).)
Walgreen's suit against N21 for various chargebacks was not "based upon, arising out of or in
connection with" a "breach" of the APA by NPI.  The APA is a contract between NPI and N21
and "[n]o parties other than [NPI] and [N21] shall have any rights by virtue of [the APA]."
(APA § 12.1.)  Walgreen's suit against N21 arose out of agreements between N21 and Walgreen.
Accordingly, as N21 implicitly admits, any breach by NPI occurred if and when "NPI had
breached the APA by not indemnifying it pursuant to [§] 1.3 of that agreement," (N21 Br. 25),
which had not yet occurred when Walgreen sued N21.[22]

The Parties could have made suits such as those by Walgreen—suits for claims allegedly
falling under the Assumed Liabilities clause—subject to the relevant indemnity provision.
Indeed, the provision detailing the indemnification obligations *of N21* expressly refers to
Assumed Liabilities, demonstrating that, when the Parties wished, they could draft an indemnity
provision directly addressing Assumed Liabilities under § 1.3(a).  That provision reads:  "[N21]
hereby agrees to indemnify, defend and hold harmless [NPI] . . . against and in respect of all
losses . . . to the extent based upon, arising out of or in connection with . . . any claim which
arises in connection with any liability or obligation of [N21] that is not an Assumed Liability."
(APA § 10.1.)  And that provision was included in addition to the identical provision at issue in

---

[22] At its core, N21's argument is circular:  N21 is entitled to indemnification on the
grounds that NPI breached the APA when it failed to indemnify N21.

§ 10.2, requiring N21 to indemnify NPI for "any breach of any covenant or agreement made by [N21]." (*Id.*) If the Parties wished to require NPI to indemnify and defend N21 in any suit arising out of an Assumed Liability, it would have used similar language in § 10.2.[23] Strictly construing the provision in favor of NPI, the putative indemnitor, Walgreen's suit against N21 did not arise out of any breach by NPI of a covenant or agreement in the APA.

Nor do the costs and fees associated with N21's cross-claims and NPI's counterclaims fall within the APA's indemnity provision. As noted above, interpretation of an indemnity clause is governed by general contractual interpretation rules. Accordingly, in considering the reach of an indemnity clause, the provision "should be given [its] natural and most commonly understood meaning in light of the subject matter and circumstances, and the language should be read in common with the other provisions of the contract." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1477 (11th Cir. 1992) (internal quotation marks omitted). And with respect to attorneys' fees arising from litigation between two parties to a contract, "if [the] agreement for one party to pay another party's attorney's fees is to be enforced it must unambiguously state that intention and clearly identify the matter in which the attorney's fees are recoverable." *Sholkoff v. Boca Raton Cmty. Hosp., Inc.*, 693 So.2d 1114, 1118 (Fla. Dist. Ct. App. 1997); *see also Wiand v. Wells Fargo Bank, N.A.*, No. 12-CV-557, 2016 WL 355490, at *2 (M.D. Fla. Jan. 29, 2016) (noting that Florida law "requir[es] unambiguous language providing for attorneys' fees" (alteration and internal quotation marks omitted)); *Civix Sunrise, GC, L.L.C.*

---

[23] One imagines that the provision would read something similar to: "[NPI] agrees to indemnify, defend and hold harmless, [N21] . . . against and in respect of all losses . . . to the extent based upon, arising out of or in connection with . . . any claim which arises in connection with any liability or obligation of N21 that is an Assumed Liability."

*v. Sunrise Rd. Maint. Ass'n*, 997 So.2d 433, 435 (Fla. Dist. Ct. App. 2008) ("To be enforceable, an agreement providing for the award of attorney's fees must be clear and specific.  An agreement for one party to pay another party's attorney's fees must unambiguously state that intention." (citation omitted)).

The Court finds that the indemnity provisions in the APA do not "unambiguously state th[e] intention," *Sholkoff*, 693 So.2d at 1118, that NPI must pay N21's attorneys' fees and costs associated with the cross-claim and counterclaim between the two Parties.  Importantly, the APA provides for certain procedural requirements that counsel in favor of interpreting the indemnity provisions to apply only to third-party claims, not claims between the Parties to the APA, because the procedural requirements do not make any sense if applied to first-party claims, and yet the APA makes clear that the procedures "shall apply with respect to *all* Claims by an indemnitee for indemnification."  (*See* APA § 10.4 (emphasis added).)  For example, the APA requires that the indemnitee give the indemnitor "prompt notice" of any claim and that neither party can settle a claim without the consent of the other, both of which clearly contemplate indemnification with respect to third-party claims only.  (*See* APA § 10.4(a), (c).)  *See also BankAtlantic*, 955 F.2d at 1477 ("The requirement of notice to [the plaintiff] upon [the defendant's] receipt of a complaint or notice of any claim in connection with [the defendant's] activities clearly contemplates third party claims, not claims by [the plaintiff] against [the defendant].");  *see also Wiand*, 2016 WL 355490, at *2 (attorneys' fees provision including "broad[] language" providing "attorneys' fees for 'any dispute between you and us involving the account'" did not unambiguously provide for attorneys' fees in first-party actions where third-party disputes "were the focus of most of the [attorneys' fees] provision").  In light of the need to

both construe indemnity provisions in non-insurance settings strictly in favor of the indemnitor and require an unambiguous statement of intent to allow for an award of attorneys' fees, the Court finds that the indemnification provision does not apply to the present situation. *Cf. See BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 654–55 (11th Cir. 2016) (finding that "broadly worded" indemnification provision requiring investor to indemnify company for "any breach of any representations or warranties or any failure to fulfill any covenants or agreements set forth in [the relevant agreement]," did not require investor to indemnify company for company's expenses incurred defending against investor's suit); *Tradex Glob. Master Fund SPC Ltd. v. Palm Beach Capital Mgmt., LLC*, No. 09-CV-21622, 2010 WL 3323750, at *1, *3 (S.D. Fla. July 13, 2010) (noting that indemnity provision in subscription agreement requiring the subscriber to "indemnify and hold harmless" the administrator against any losses, including attorneys' fees, which result from any "breach of warranty, condition, covenant or agreement set forth in [the subscription agreement]," did not "contain an uncontrovertible prevailing party provision" that would counsel in favor of applying the provision to allow for attorneys' fees in a "dispute between the parties [to the agreement]"); *Tecnoclima, S.p.A. v. PJC Grp. of N.Y., Inc.*, No. 89-CV-4337, 1995 WL 390255, at *1–2 (S.D.N.Y. June 30, 1995) (finding that indemnification provision requiring manufacturer to indemnify and hold harmless distributor against all losses including legal fees and expenses "caused by and arising out of . . . a breach of the warranty . . . given by the [m]anufacturer" did not cover claim for indemnification of attorneys' fees by distributor for fees expended in suit against manufacturer).[24]

---

[24] Moreover, at bottom, N21's cross-claim against NPI was a suit for indemnification. N21's briefing concedes as much. (*See* N21 Br. 25 ("N21 had to hire separate counsel in order

34

Because the Court determines that the APA's indemnity provision does not cover the situation in this case, the Court need not address the procedural issues surrounding the indemnity claim, and the Court affirms the bankruptcy court's decision denying N21's claim for attorneys' fees.

### III. Conclusion

For the reasons given herein, the Parties' appeals are denied and the judgment of the bankruptcy court is affirmed. The Clerk of the Court is respectfully requested to close this case.

SO ORDERED.

Dated:     White Plains, New York
           October 25 , 2016

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

to . . . compel NPI to perform its indemnification obligations pursuant to [§] 1.3 of the APA . . . .").) However, "attorney's fees incurred in establishing the right to indemnification are not allowable." *Fallstaff Grp., Inc. v. MPA Brickell Key, LLC*, 143 So.3d 1139, 1143 (Fla. Dist. Ct. App. 2014) (quoting *Snider v. Cont'l Ins. Co.*, 519 So.2d 12, 13 (Fla. Dist. Ct. App. 1987)); *see also Post Houses, Inc. v. Fireman's Fund Ins. Co.*, 469 So.2d 863, 864 (Fla. Dist. Ct. App. 1985) (same).